410 So.2d 869 (1982)
Mrs. Terry MOLENAAR, widow of Arthur John Phillpott
v.
McGILL MANUFACTURING CO., INC., August J. Berner, Frederick W. Berner, all other Officers, Agents and/or Employees of Berner's Inc., Sentry Insurance, a Mutual Company and/or Sentry Indemnity Company.
No. 12568.
Court of Appeal of Louisiana, Fourth Circuit.
February 9, 1982.
Rehearing Denied March 19, 1982.
*870 Schaff & Currier, Val A. Schaff, III, George L. Wax, New Orleans, for plaintiff-appellant.
Wood Brown, III, New Orleans, for defendant-appellee McGill Mfg. Co., Inc.
Hulse, Nelson & Wanek, John I. Hulse, IV, New Orleans, for defendant-appellee August J. Berner, Frederick W. Berner and Sentry Ins., a Mut. Co.
Before LOBRANO, BARRY and KLEES, JJ.
LOBRANO, Judge.
Mrs. Terry Molenaar, widow of Arthur John Phillpott instituted these proceedings in the Civil District Court of Orleans seeking damages for the wrongful death of her husband, Arthur J. Phillpott. Decedent was a 22 year old air-conditioning mechanic employed by Berner's Inc. He was initially employed in May of 1973 as a mechanic's helper, and was promoted to air-conditioning mechanic around May 15, 1975. On June 2, 1975 while working on the installation of a central heating and air-conditioning system in the attic of the home of J.T. LaNasa located at 3611 Gentilly Boulevard, New Orleans he was electrocuted.
The evidence shows that on June 2, 1975, the decedent and his helper, Ronnie Ryals, arrived at the job site sometime in the early afternoon, whereupon Ryals began unloading tools from their service truck in order to start working. It was necessary that decedent work in the attic of the LaNasa home which had no electrical current flowing to it. In order to illuminate the working area, Ryals took a trouble light from the truck, plugged it into an extension cord that was lying on the floor of the living room and hung the light over a rafter in the attic.[1] The cord on the trouble light was a three wire cord and required a three-wire socket to plug into. The extension cord used was a three-wire extension cord which had such a three-wire socket. However, the LaNasa home was an older home which had a two-wire system, and the receptacle supplying the electricity to the extension cord, and thence to the trouble light was a dual-slot type. In order to plug the three-wire extension *871 cord into the two-slot receptacle, a three-pronged adapter had to be used. This adapter has a small green wire, commonly called a "pigtail", which must be grounded in order to properly ground the entire circuit. The record indicates the "pigtail" was not connected or grounded in this particular case.
The decedent worked in the attic for approximately 3 hours when he told his helper to gather their tools and prepare the daily report as he would soon be ready to leave. The testimony shows that the temperature in the attic was in excess of 100 degrees, and that decedent was perspiring profusely throughout the afternoon. As Ryals was preparing the daily report, he realized that approximately 20 to 30 minutes had elapsed since decedent told him to gather the tools. Ryals went back in the attic and found decedent slumped over the central heating and air-conditioning unit. Immediately Ryals called to LaNasa, and a friend, Danny McCune, to help get decedent out of the attic. Their first impression was that Mr. Phillpott had fainted from heat. However it was later learned that he died from electric shock. The evidence was overwhelming at trial that decedent was electrocuted, and the cause of the electric shock is the real issue of this case.
The plaintiff sued McGill Manufacturing Co., Inc., alleging that their product, the trouble light, was manufactured, designed and/or constructed defectively. In addition, August J. Berner and Frederick W. Berner were sued as executive officers of Berner's Inc.
This matter was tried before a jury, and after eight days of testimony their verdict was as follows:
1) The trouble light was involved in the accident which caused Phillpott's death.
2) The trouble light was not in normal use at the time of the accident.
3) The trouble light was not defective in its design, manufacture or construction at the time it left the manufacturer.
4) There was negligence involved in the assembly of the light, and that it did contribute to the accident.
5) Decedent did not negligently assemble the light.
6) Neither Frederick nor August Berner breached any personal duty owed to decedent.
7) Peppo (the field supervisor) was delegated the duty of care owed to decedent, but he did not breach same.
8) Decedent was negligent in failing to use the grounding cable, adapter pigtail, ohmmeter or other devices to ground the trouble light and in knowingly using the ungrounded light when he was wet with perspiration.
As a result of that verdict, plaintiff perfected this appeal alleging 14 specifications of error. Those can be summarized or categorized as follows. Specifications 1 and 2 deal with the charges or lack thereof given on products liability. Specifications 3, 4 and 5 deal with the charges or lack thereof given on executive officer responsibilities and duties. Specifications 6, 7, 8, 9 and 10 deal with the charges or lack thereof given on contributory negligence. Specification 11 merely alleges that the jury verdict was manifestly erroneous. Specifications 12, 13 and 14 allege error by the trial court for excluding and including certain evidence during the course of the trial.
Before this Court immerses itself into the literary canyons of products liability and executive officer responsibilities, we feel compelled to set forth our duty as an appellate court since all parties have thoroughly briefed this point. The often cited case of Canter v. Koehring, 283 So.2d 716, (La.S.Ct.1973) and subsequent cases, particularly Arceneaux v. Domingue, 365 So.2d 1330 (La.S.Ct.1978), set forth the standard which we are to follow. That standard requires that this Court not disturb the factual findings of the trial court (whether judge or jury) in the absence of manifest error. We also understand that our duty is to review the entire record to determine if there is manifest error in the ultimate conclusion reached by the trial court.

*872 "Therefore, the appellate review of fact is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (Manifestly erroneous)." Arceneaux v. Domingue, id. at p. 1334.
We will not substitute our own evaluations or preferences for that of the fact trier unless those of the fact trier are clearly wrong.
Product Liability (Specifications 1 and 2)
The evidence reveals that Berners purchased the subject trouble light in a disassembled condition. That is, the light was not connected to a cord and apparently it is sold by McGill with or without such a cord. Although the testimony fails to reveal who made the connection of the light to its cord, we are satisfied that someone at Berner's did so. Plaintiff alleges that the light was defective for a variety of reasons, including a failure on the part of McGill to provide proper instructions for installation and proper "danger" warnings.
The Louisiana Supreme Court in Weber v. Fidelity and Casualty Co., 259 La. 599, 250 So.2d 754 (1971), as well as the subsequent jurisprudence has well defined the guidelines to be applied in the present case. In order for a plaintiff to prevail he must prove that the product was in normal use, that the product was defective in design or manufacture, and that the defect was the cause of the accident or injuries. In Weber, supra, the Supreme Court said:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff, claiming injury has the burden of proving that the product was defective, i.e. reasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." Weber v. Fidelity and Casualty Co., id. at p. 755.
The latest expression by the Supreme Court in this area appears in Hebert v. Brazzel, 403 So.2d 1242 (La.1981) wherein the principles of Weber are reaffirmed, with the following additional comment:
"A manufacturer must give warning of any danger inherent in this product's normal use which is not within the knowledge of an ordinary user." Hebert v. Brazzel, id. at p. 1245.
Appellant complains that the trial judge was in error in failing to charge the jury in accordance with the language of Penn v. Inferno Manufacturing Corporation, 199 So.2d 210. We have reviewed the trial court's jury instruction and have found them proper when considering all of the evidence presented at trial. The lower court gave a clear and concise recital of the Weber case standards, and we find no error in its charges in that regard.
Turning to the basic factual issues on the alleged defective light, the Court makes the following observations. Plaintiff's expert Dr. Leonard Adams testified that the spacing between the uninsulated live parts and accessible metal did not conform to acceptable standards. Because of the closeness of the spacing, moisture could bridge the "space gap" and cause an electrical short. Particularly, he stated that the spacing between the convience outlet and the ground connection was defective and was the probable cause of Phillpott's electrocution. Defendant, McGill, however, pointed out that the light was designed in accordance with the National Electrical Code. This was even admitted by plaintiff's expert, although he felt the code should be rewritten on this aspect. It was also brought out that Dr. Adams did not examine the "trouble-light" until approximately three years after the accident. Many of the witnesses testified that the light had been handled quite often, and appeared to be materially altered since their initial viewing of same.
*873 Appellant also argues that the light was defective because of the use of a bone fiber paper between the convience outlet and the "on/off" switch and that said fiber was not moisture proof. Dr. Adams suggests that perspiration from the decedent could have penetrated the light causing the bone fiber paper to become a conductor of electricity, thus causing current to flow through the protective cage around the light bulb, and ultimately through decedent's body. Dr. Adams described in detail the tests he performed, and explained their results. Mr. John Mass, defendant's expert, and vice president of McGill testified that he had been involved in the design and manufacture of this type of implement since 1965. That the light was designed in accordance with the National Electrical Code, was in complete compliance with the Underwriters' Laboratories standards and that this was the very first time there had been an accident with this type of light.
As a last argument, appellant contends that defendant, McGill failed to provide the consumer with proper instructions for installation, and failed to warn of the danger in the use of the light. The document submitted in evidence which purports to be the assembly instructions has been approved by the National Electrical Code and Underwriters' Laboratories. We find they are clear and concise, and were viewed by the jury.
Applying the evidence to the law as cited in the Weber case, and subsequent cases, the jury found that the light was not defective in its design or manufacture at the time it left McGill, and further that it was not in normal use at the time of the injury. The evidence was overwhelming that the light was not properly grounded at the time of the accident, and thus we conclude there was no error in that finding. Further, we find no manifest error in their finding of no defect. Even if the jury had found a defect in the light, the obvious fact that it was not being used properly would have precluded recovery. The trouble-light is designed and manufactured for use with a three wire grounding system, the purpose of which is to prevent electrical shock should a short circuit occur. If the grounding system is not used as intended, certainly that is supportive of the conclusion that it was not in normal use. The jury reached its verdict in this regard after hearing all of the testimony, and reviewing all the evidence presented. We see no reason to change its conclusion.
Executive Officer Liability (Specifications 3, 4 and 5)
As previously stated August Berner and Frederick Berner, as executive officers of Berner's Inc. were sued on the grounds that they failed to have a safety program in effect, and failed to furnish decedent with a safe place to work. Berner's Inc. was originally started by Fred and August Berner sometime in 1947. They specialize in heating and air-conditioning sales, service and installation. In June of 1975, August Berner was President and General Manager of the Company. Fred Berner was only involved in the sales and appliance part of the company and had no dealings with construction or installation. At the time of the accident Berner's had approximately 100 employees, approximately 15 of which were mechanics. The chain of command appeared to be August Berner, President and General Manager, then Walter Bott, treasurer, Richard Laudun, construction service manager and Joe Peppo, field supervisor.
The testimony of August Berner reveals that as of June 1975, he had delegated to Richard Laudun the duty to provide training and safety sessions to the mechanics and helpers. It is clear that these meetings did not specifically deal with safety, but all features of service and installation. Basic electricity was necessarily a part of these meetings, as well as safety. As stated by August Berner, Richard Laudun and Octave (Joe) Peppo, safety was a day to day occasion at Berner's. August Berner also testified that putting together the trouble-lights was the job of the parts manager, Jake Kunzlies. However several other former mechanics, as well as Peppo and Laudun, testified that it would not be unusual for a mechanic to put a light together himself. *874 Berner and his supervisors were well aware that each mechanic had enough knowledge about basic electricity from their practical experience to competently put such a light together.
Richard T. Laudun testified that Joe Peppo was designated the safety man in the field, and that most of the safety at Berners was taught on the job site. Peppo acknowledges that this responsibility was delegated to him, and testified that safety was emphasized on a day to day basis. Peppo's background and qualifications, as well as his years of practical experience made him the logical choice by Laudun. Appellant strenuously raises the issue that Berner's had no person designated as "safety manager" per se, nor did they have any special safety classes. Peppo testified that he held training classes, which included safety and basic electricity, every 2nd Tuesday from 5 to 7 in the evenings. In addition the helper trainees received training on a day to day basis from the mechanics that they were working under. As confirmed by Peppo, it would have been impossible to check each and every piece of equipment on a daily basis. The training and experience of the mechanics was such that a certain responsibility in that regard had to rest on their shoulders. More particularly, the testimony of Mark Aucoin, Milton Flemming and John Kain, all former mechanics at Berner's indicates that their training and experience prior to becoming mechanics included basic safety techniques. John Kain testified that he installed the duct work and insulation in the LaNasa attic a day or so prior to decedent working there. He grounded all of the power tools he used, including his trouble light, to the sewervent pipe. This, he says, was good electrical practice, and his prior experience and training told him to do this.
Prior to the enactment of Act 147 of 1976, amending La.R.S. 23:1032, which now precludes such actions, an officer, agent or employee or principal could be liable to a third person (including a co-employee) when injuries caused to such third persons resulted from a breach of a duty imposed by his principal or employer upon the officer, agent or employee. The most typical breach of duty is the one to provide a safe place to work. The criteria which must be satisfied before individual liability will be imposed on executive officers is set forth in Canter v. Koehring, 283 So.2d 716 (La.S.Ct. 1973).
"1. The principal or employee owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk of others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or malperformance and has nevertheless failed to cure the risk of harm." Canter v. Koehring, id. at 721.
Specifically, in order to find an executive officer liable, there must be a breach of *875 "personal fault" as opposed to vicarious fault. If the defendant's general responsibility has been delegated to a subordinate who is responsible, and qualified, then he cannot be held personally liable for the negligent performance of this responsibility "... unless he personally knows or personally should know of its nonperformance or mal-performance and has nevertheless failed to cure the risk of harm." Canter v. Koehring, id. at 721.
We do not disagree with the contention of appellant that Berner's Inc., as decedent's employer, had a duty to provide him with a safe place to work. However, we disagree with the allegation that August or Frederick Berner or any other supervisor or agent of Berner's is responsible. The evidence is clear that August Berner delegated responsibility to Richard Laudun to oversee training and safety. Laudun in turn, delegated field safety to Octave (Joe) Peppo. Both of these men were more than qualified to handle these responsibilities, and we find they were carried out. There is no evidence that either Frederick or August Berner had any constructive or personal knowledge of any fault with the trouble light. We agree with the finding of the jury in this regard.
Contributory Negligence (Specifications 6, 7, 8, 9 and 10)
Since we have reached the conclusion that there was no breach of duty by an executive officer, agent or employee at Berner's Inc., the question of contributory negligence is moot. However, we must agree with the jury's findings that decedent was contributorily negligent. All of the experts testified that the accident would probably not have happened had the trouble-light been grounded. Decedent had enough basic electrical knowledge to know this.
For the foregoing reasons, the judgment of the lower court is hereby affirmed.

ON REHEARING
Appellant argues on rehearing that the electrocution of decedent resulted from the negligence of a co-employee. However, assuming arguendo there was negligence on the part of a co-employee, that negligence is not attributed to Frederick or August J. Berner under a vicarious liability theory. Appellant must prove that those executive officers breached a duty owed to decedent. The jury found that there was no breach of duty.
Rehearing denied.
NOTES
[1] The LaNasa home was undergoing extensive renovations and the extension cord was apparently left there by other persons working on the home.