430 So.2d 1051 (1983)
Joseph N. LANDRY, Sr.
v.
BILL GARRETT CHEVROLET, INC., et al.
No. 13217.
Court of Appeal of Louisiana, Fourth Circuit.
March 4, 1983.
Rehearing Denied May 24, 1983.
Writ Granted June 27, 1983.
*1052 Val A. Schaff, III, Schaff & Currier, New Orleans, for appellee/plaintiff.
Gerard M. Dillon, Dillon & Cambre, New Orleans, for defendant/appellant Bill Garrett Chevrolet, Inc.
Peter L. Bernard, Jr., Joseph S. Palermo, Jr., Bernard, Cassisa, Babst & Saporito, Metairie, for defendants/appellants Gen. Motors Corp. and Royal Globe Ins. Co.; Otis M. Smith, Gen. Counsel, William J. Kemp, Jr., Nicholas J. Wittner, Gen. Motors Corp., Detroit, Mich., of counsel.
Before LOBRANO and WARD, JJ., and G. WILLIAM SWIFT, Jr., Judge Pro Tem.
LOBRANO, Judge.
This case presents the serious issue of whether or not hypnotically induced testimony should be excluded in civil cases as a matter of law. At the outset, we note that there are several issues raised by both appellants, but we are of the opinion that the three discussed below are dispositive of this case. We further note that we are not unmindful of our Supreme Court's pronouncements in Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975) requiring a decision by this Court when the record so dictates, we nevertheless remand for the reasons hereinafter set forth, and in accordance with Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980).
Plaintiff, Joseph Ned Landry, (Landry), instituted these proceedings against defendants, Bill Garrett Chevrolet, Inc. (Garrett) and General Motors Corporation (GM) seeking *1053 recovery for personal injuries received in an automobile accident that occurred on July 20,1976. The claim against Garrett is based on negligence, and the claim against GM is based on product's liability. After a trial by jury, plaintiff was awarded damages in the amount of $1,948,547.00 against both defendants in solido. From this judgment both defendants have perfected this appeal. Plaintiff answered the appeal seeking an increase in the award.
On November 18, 1975, Landry and his wife, purchased a new 1975, Chevrolet Vega "Hatchback" from Garrett. The automobile was for the principal use of Mrs. Landry, and was operated by the plaintiff on only one or two occasions. On the sixth week following the purchase of the vehicle, Mrs. Landry testified she experienced a problem with the steering of the automobile. She stated that on making a right turn into a driveway, the steering wheel in the automobile turned freely; made complete circles without having engaged the wheels of the automobile. She stopped the vehicle and turned the steering wheel until such time as the wheels did engage and responded to turning direction. She proceeded immediately to Garrett and made a complaint about the steering system. She further testified that she experienced the same phenomenon a second time on May 27, 1976. At this time, she was turning off Interstate 12 onto the service road connecting with Interstate 10, when somewhere in the middle of the road, she again experienced freewheeling of the Vega automobile. She stopped the vehicle, flagged down a motorist, requested him to contact her daughter and to have her pick her up at Garrett's place of business. She returned to the automobile and turned the steering wheel until such time as she was able to control the direction of the vehicle. She again went directly to Garrett by use of the emergency lane of the I-10 system, and upon arriving at the dealer's place of business, again, gave a complaint about the steering system.
On July 20, 1976 while driving the Vega for the first or second time, plaintiff sustained severe injuries when the vehicle crashed into the road divider and overturned at a point west of the crest of the I-10 bridge over the industrial canal. Plaintiff's version of the facts of the accident as testified by him at trial, are basically as follows: Upon leaving his home in Slidell and arriving at his daughter's home on Chef Menteur Highway, he experienced no difficulty with the Chevrolet Vega. Upon leaving his daughter's home sometime after 9:00 a.m. and proceeding onto Chef Menteur to its access with the I-10, he experienced no difficulty with the automobile. Upon making a sweeping right-hand turn from Chef Menteur onto the access road of the I-10 system, he stated he felt some odd sensation with the steering of the Vega. He did not know what had occurred, but at some point when he tried to correct or steer the vehicle to the right, he felt that the steering wheel had locked and that he had no control whatsoever. Mr. Landry continued driving the automobile, struggling with the steering wheel to correct the drift of the car, to keep it in the center lane of traffic, but was unsuccessful. From the time he noticed the locking of the steering wheel until he got beyond the crest of the bridge, the automobile had drifted from the center lane of traffic to the left hand lane of traffic. At some point west of the crest of the bridge, the automobile impacted into the road divider and turned over causing his injuries and a total loss of the automobile itself.

HYPNOTICALLY INDUCED TESTIMONY
Before trial, GM filed a motion in limine seeking to exclude plaintiff's testimony on the basis that it had been hypnotically developed. Alternatively, they argued that plaintiff, before testifying, must establish a foundation that recollection by hypnosis is reliable. The trial court denied this motion ruling that hypnosis was a credibility issue for the jury's determination.
Approximately 14 months after the accident plaintiff's deposition was taken at which time he testified he had no memory of the accident or its causes. Subsequently, *1054 plaintiff underwent hypnosis with the aid of a person only identified as "Commander". According to Mrs. Landry's deposition, during that hypnotic session with "Commander" plaintiff recalled that his steering wheel locked. After this session, a local psychiatrist, Dr. Richard Steck, hypnotized plaintiff on two other occasions resulting in his recall of the accident. At trial, plaintiff testified without any type of foundation being laid, and without the jury ever knowing about his hypnotic sessions. Outside the presence of the jury GM proferred the testimony of Dr. Martin T. Orne to substantiate its motion in limine. We have this testimony before us, as well as the videotaped sessions of the plaintiff's two sessions with Dr. Steck.
The only non-criminal Louisiana case we are able to find involving hypnotically recalled testimony is Watson v. Morrison, 340 So.2d 588 (La.App. 1st Cir.1976). That case does not shed any insight into the question of whether or not as a matter of law testimony resulting from hypnosis should be excluded. Clearly, the recitation by the hypnotist of the recollection by his patient is inadmissable hearsay evidence. The Court in the Watson case, although not faced with the direct question of excluding the testimony of the patient, recognized the problems associated with hypnosis, and stated:
"Susan Morrision's testimony is subject to close scrutiny because she supposedly had no recollection of the accident from its date until she visited Dr. Joseph L. Palotta, a psychiatrist... The accuracy of her reconstructed memory, if accepted must at least be subject to careful review and probative evaluation for several reasons. First, whether hypnosis produces truthful recollections is at best a controversial question... Next, whether Susan's recollections under hypnosis were uncontaminated by information she had acquired from other sources since the accident is questionable.... Watson, supra at 592.
In a recent criminal matter decided by the Louisiana Fifth Circuit Court of Appeal a witness's identification of the defendant was suppressed as suggestive because hypnosis was used. State v. David Brian Culpepper, No. 82-K-158, (La.App. 5th Cir., Dec. 1982). The Court in Culpepper gives an exhaustive summary of the jurisprudence throughout the country dealing with hypnosis, and although the decision does provide historical and technical assistance to this Court, the ultimate decision in that case is based on a violation of the substantive due process rights of the defendant. The Court stated:
"Considering that the identification was not made until after the hypnotic session, the excessively suggestive identification procedure incorporating the use of hypnosis is so likely to produce a misidentification that we are compelled to decide that the due process rights of the defendant have been violated." State v. Culpepper, id, at p. 12 slip opinion.
Although it can be argued that in a civil case the substantive due process rights of the parties may be affected by hypnotic testimony, this Court is of the opinion that the issue is more of procedural due process, more specifically the competency of the witnesses's testimony. Jurisprudence throughout the country on the issue of hypnotism falls into three categories. The first category is those cases which exclude hypnotically induced testimony as a matter of law.[1] Those which do not exclude such testimony as a matter of law, but require strict guidelines and a foundation prior to testifying form the second category.[2] The third category encompasses those cases which hold that the credibility of a witness' testimony is a question to be determined by the fact finder, whether judge or jury, requiring no *1055 specific foundation.[3] The federal jurisprudence interprets the issue as one of credibility to be ultimately decided by the fact finder.[4]
Jurisprudence reviewed by this Court analogizes hypnotically induced testimony to the use of scientific evidence citing Frye v. United States, 54 U.S.App.D.C. 46, 293 F. 1013 (1923). The test established by Frye provides that scientific evidence should be admissible only when "... the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Id. at 1014. Although noting that the "general acceptance" standard has been the subject of considerable scholarly criticism the Louisiana Supreme Court in State v. Catanese, 368 So.2d 975 (La.1979) nevertheless excluded polygraph evidence stating:
"... after considering the evidence in the instant case and studying the authorities and extensive literature in the field, we conclude that it shall be the judicial policy of Louisiana to exclude polygraph evidence in criminal trial at this time. In doing so, we do not rely upon the `general acceptance' standard which has barred admissibility in the past. Instead, we reach this conclusion after carefully considering the arguments for and against the introduction of polygraph evidence. We recognize the high probative value of polygraph evidence when obtained under optimal conditions. However after engaging in a balancing process at the appellate level similar to that recommended by McCormick and other writers, we conclude that at present in our Court system the probative value is so outweighed by the reasons for its exclusion that the evidence should not be admitted in criminal trials." Id. at 981.

The Court did point out that in certain controlled circumstances the use of polygraph tests is a helpful tool in police investigations and therefore the exclusionary rule would be limited only to the actual trial of a defendant. The Court did not preclude its use at preliminary or post conviction hearings. The Louisiana Fifth Circuit followed the rationale of Frye and Catanese, in suppressing a hypnotically induced identification. State v. Culpepper, supra.
It would be relatively simple for this Court to apply the Frye, Catanese and Culpepper cases in this civil proceeding, and exclude plaintiff's testimony in toto. However, we feel the solution is not that easy. As previously noted, the vast majority of the jurisprudence dealing with this subject is criminal in nature. Although the rules of evidence may appear to be similar, the bottom line in a criminal case is the guilt or innocence of the defendant, and the protection of his constitutional rights. In a civil case the Court acts as the referee in a dispute between the litigants, and its responsibility is one of fairness, and an impartial application of the law to the facts presented. The ultimate bottom line in a civil matter is to determine which litigant should prevail based on the facts presented. Evidentiary rules have developed to minimize the possibility of falsifying those facts. We therefore feel that the issues raised by the use of hypnotically induced testimony in civil cases should be resolved somewhat differently than in criminal matters. We prefer to rely on established rules of evidence dealing with competency and credibility.
Competency is defined by Black as "... the presence of those characteristics, or the absence of those disabilities, which render a witness legally fit and qualified to give testimony in a court of justice..." Black's Law Dictionary, (5th ed. 1979). La.R.S. 13:3665 defines a competent witness "... in any civil proceeding in Court before a person having authority to receive evidence shall be a person of proper understanding." Credibility is defined as "Worthiness of belief; that quality in a witness which renders *1056 his evidence worthy of belief." Black's Law Dictionary, supra. The common law rules of incompetency have been undergoing a process of piecemeal revision by statute and the tendency to totally exclude a witness has been pushed aside in favor of impeaching his credibility. McCormick on Evidence, Sec. 61 (2nd ed. 1972).
Our Civil Code distinguishes credibility and competency by providing:
"The circumstances of the witness being a relation, a party to the cause, interested in the result of the suit, or in actual service or salary of one of the parties, is not a sufficient cause to consider the witness as incompetent, but may, according to circumstances, diminish the extent of his credibility." La.C.C. Art. 2282.

In its simplest terms competency deals with the capability of a witness to testify to certain matters, whereas credibility deals with the reliability of the witness. If a witness is incompetent he should not testify. However, if there are doubts about the accuracy of his testimony, he is permitted to testify, but his credibility is subject to impeachment.
Hypnosis is defined in Commonwealth v. Nazarovitch, 496 Pa. 97, 436 A.2d 170 (Pa.1981) as "... a sleeplike state whereby response to stimuli is more easily achieved than in a waking state ... hypnosis is achieved by creating a passiveness in the subject usually by employing eye fatigue." Id. at 173. The proffered testimony of Dr. Martin Orne[5] gives quite an insight into the pitfalls and inherent dangers in use of hypnotism. His conclusions can be summarized as follows:
1. Hypnotism, by its nature, is a process of suggestion, and as a result, the person hypnotized is extremely receptive to suggestions from the hypnotist. These suggestions can be intentional and unintentional.
2. The person under hypnosis may produce the responses that are expected of him, rather than true responses. Those responses may be mere fantasies or confabulations used to fill "gaps" in the memory.
3. Because the person being hypnotized is told that he will be able to remember under hypnosis, he is reinforced in his belief that all recollections under hypnosis are true facts, irrespective of whether they are true or not. This makes cross-examination of the witness extremely difficult since he actually believes what he says is true.
4. Psychiatrists and psychologists, in their treatment of patients using hypnosis are not interested in determining whether the recollection is historically accurate. They are interested in the emotional accuracy for therapeutic purposes. Courts are concerned with historical accuracy, and therefore the hypnotist should be made aware of the need for such accuracy.
We also point out that Dr. Orne readily admits that hypnosis does induce more information and as a result, there is more correct information as well as incorrect information.
Inasmuch as hypnosis produces recollection (whether fabricated or not) where there was none, this Court is of the opinion it should not be excluded as a matter of law. Instead we choose to use a balancing process with procedural safeguards similar to State v. Hard, footnote 2, supra. More particularly the trial judge should require that a foundation be laid prior to receiving testimony induced by hypnosis. That foundation should satisfy the trial court that: (1) the hypnosis was performed by competent qualified personnel; (2) that the method employed is acceptable in the community; (3) that the witness was not unduly influenced, or subjected to suggestions about issues material to the case; (4) that the witness did have a true memory loss *1057 prior to hypnosis, and that his testimony is essential to the case. Once the trial court is satisfied, then the witness should be allowed to testify.[6] The opposing party may present whatever evidence he deems necessary to impeach his credibility, or the credibility of hypnosis. The ultimate decision on the veracity of the evidence will be up to the fact finder.[7]
THE TRIAL COURT ERRED, WHEN DURING JURY DELIBERATIONS, IT MODIFIED A JURY INTERROGATORY BY DELETING THE FORSEEABILITY PORTION OF THE WEBER CHARGE.
The Louisiana Supreme Court in Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (La.1971), set forth the elements of a products liability claim in Louisiana. Justice Tate writing for the Court stated:
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective; i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." Id. at 755.

These elements apply when a design or manufacturing defect is alleged. In accordance with the language in Weber, the trial court submitted an interrogatory to the jury asking, "Was the Vega automobile, at the time it left the factory, defective, i.e. unreasonably and forseeably dangerous in normal use?" During the jury deliberations, the foreperson appeared in chambers stating that a nine person majority could not be reached because of the inclusion of the forseeability element in the interrogatory. The trial court indicated that the word "forseeably" had been included in the interrogatory to capture the meaning in Weber of the phrase "... if the injury might reasonably have been anticipated." Nevertheless, the trial court decided to strike the words, "and forseeably" from the interrogatory giving the following reasons for doing so:
"It seems to me that inclusion [of the forseeability element] in Weber was an essential piece of dicta, it doesn't fit in with my notions of strict liability, it is not included in Restatement of Torts, Section 402(A), so with complete consideration of what we are doing I am now striking from the interrogatory `and forseeably', and that will pose for appellate review the square issue, squarely pose the issue of whether Weber really meant to say, really meant to include an issue of forseeability of injury."
Appellant asserts that the ruling of the trial court was unwarranted judicial legislation in that Louisiana has not, by statute or Supreme Court pronouncement, adopted Section 402(A) of the Restatement (Second) of Torts. Appellant argues that among other requirements, the Weber Court required proof that "the injury might reasonably be anticipated" by the manufacturer and as such, forseeability is a necessary and essential element in a products liability case.
Although we must agree with appellant that forseeability is not dicta but an essential element of the Weber decision, we must recognize that the confusion of the trial court was not unfounded or unwarranted considering the language in Weber and the jurisprudence following Weber. Louisiana has not adopted Section 402(A) of the Restatement *1058 but it has not rejected it either. The first thing to note about the Weber holding is its functional similarily to the Restatement. The principles in Section 402(A) are clearly "strict liability in tort" which does not depend upon warranty or negligence but is imposed upon the manufacturer on a showing that its defective product caused the injury. While the Weber court made no specific reference to the Restatement (Second) of Torts Section 402(A), it is couched in quite parallel terms. Moreover, the use of the clarifying word "however" to preface that part of the decision dealing with plaintiff's burden of proof clearly displays that it was not negligence liability Justice Tate had in mind:
"... However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." Weber, supra, at 755.
The strict liability theory is further supported when Justice Tate concludes:
"If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them." Weber, supra at 756.
The approach in Weber is clearly functionally equivalent to the common law's strict liability in tort. Yet, it cannot be denied that the words, "without fault on his part" and "if the injury might reasonably have been anticipated" in the Weber holding are elements of negligence; the former as to contributory negligence and the latter as to forseeability. In Spillars v. Montgomery Ward & Co., 294 So.2d 803 (La.1974), the Court of Appeal quoted extensively from the Weber decision viewing it as establishing a form of strict liability in tort. The Supreme Court affirmed without mentioning Weber, but specifically concludes:
"The failure to inspect for size the sixteen year old wheel, once purchased from a junk yard, cannot fulfill the responsibility of care which the law places on the manufacturer of an object which, if defective, can reasonably be expected to cause injury." Id. at 807.
Justice Tate, the Weber author, points out in a separate opinion,
"Strict liability for such fault should be enforced for a retailer of products unreasonably dangerous in normal use, just as it is in Louisiana for manufacturers, Weber v. Fidelity & Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971), and just as it is in other American jurisdiction for similar reasons, Restatement of Torts 2d, Sec. 402(A) (1965), Annotation Products Liability, 13 ALR 3rd 1957 (1967)." Spillars, supra at 810.
As a result of Spillars the weight of authority appeared to favor a strict liability approach. Subsequent to Spillars, our Supreme Court in Hunt v. City Stores, Inc., 387 So.2d 585 (La.1980), reaffirmed a requirement of forseeability on the part of the manufacturer, by stating:
"Thus, under Weber, the plaintiff in a products liability suit must only prove that the product was defective, i.e., unreasonably dangerous to normal use; that the product was in normal use at the time the injury occurred; that the product's defect caused his injury; and that the injury might reasonably have been anticipated by the manufacturer." (Emphasis added) Id. at 589.

In an attempt to define the strict liability element of "unreasonably dangerous" our high court "walked a tight rope" between negligence and absolute liability in DeBattista v. Argonaut Southwest Ins. Co., 403 So.2d 26 (La.1981), wherein Justice Dennis stated:
"We recognize that the words `unreasonably dangerous' may serve the beneficial purpose of preventing the manufacturer from being treated as the insurer of its products. We conclude, however, that the term may be used only for this purpose, and certainly not to burden the injured plaintiff with proof of an element which rings of negligence. Otherwise, *1059 the formulation of strict liability in practice rarely would lead to a different conclusion than would have been reached under the laws of negligence." (citations omitted). Id. at 31.

Even though the Court recognized that "... the very purpose of strict liability is to relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty remedies ...", ibid, remnants of negligence still persist.
Because of the dual interpretations of Weber by the Supreme Court, the appellate courts of this state have also taken divergent views as to the meaning of Weber both within and between the circuits. In affirming the trial court as to the liability of GM in Hingle v. General Motors Corp., 411 So.2d 647 (La.App. 4th Cir.1982), this Court citing Weber, held:
"... a manufacturer of a product (such as an automobile) which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who sustains an injury caused by a defect in the design, composition or manufacture of the article, if the injury might reasonably have been anticipated, but only when the purchaser or third person is without fault." Id. at 649.
This decision includes both the forseeability element and the contributory negligence element contained in Weber. See also, Walter v. Valley, 363 So.2d 1266 (La. App. 4th Cir.1978), and Leaber v. Jolley Elevator Corporation, 354 So.2d 746 (La. App. 4th Cir.1978).
On the other hand, this Court in Daniels v. Albach Company, Inc., 365 So.2d 898 (La. App. 4th Cir.1978) held that in order to prevail the plaintiff need only prove:
"... 1) a defect in the product; 2) that at the time of its failure it was in normal use; 3) that it was unreasonably dangerous in that use; and 4) the injuries were caused by the defect." Id. at 900.

Forseeability was expressly excluded. See also, Ray v. Sears Roebuck & Co., 406 So.2d 1358 (La.App. 4th Cir.1981); Molenaar v. McGill Manufacturing, 410 So.2d 869 (La.App. 4th Cir.1982); and Nevle v. National Presto Industries, 416 So.2d 144 (La. App. 4th Cir.1982).
Thus, it is clear to this Court that the jurisprudence as to products liability has vacillated between strict liability and negligence, with an apparent trend in the direction of strict liability. The issue is to determine, in spite of the divergent jurisprudence, whether the element of forseeability is a major part of our law of products liability at the present time. Although direction, tone and attitude of the jurisprudence persuades us to believe that the Supreme Court will continue its development of the doctrine of strict liability in conformance with the Restatement, until such time as Weber is modified we must conclude that forseeability as expressed in Weber and enunciated in Hunt is a necessary element of products liability law in Louisiana and should not have been excluded from the jury interrogatory.
THE TRIAL COURT ERRED IN ADMITTING CERTAIN REPORTS INTO EVIDENCE
Appellant, General Motors, asserts that the trial court erred when it admitted into evidence reports of alleged steering problems in General Motors vehicles other than the subject vehicle. Before trial, GM, was ordered to produce hundreds of complaint reports furnished to the National Highway Traffic Safety Administration (NHTSA) regarding alleged steering problems in certain GM vehicles. GM asserted the reports were unfounded, irrelevant, prejudicial and based on hearsay and moved in limine to exclude any reference to such reports at trial. During the trial, the court, over GM's objections, accepted into evidence: 1) twenty three reports discussing the presence of dirt and particle matter in the power steering systems of GM Cadillac automobiles manufactured during the 1969 to 1971 model years; (2) one product problem summary report relative to claims about the presence of dirt or particle matter in the power steering systems of GM Cadillac automobile manufactured during the 1969 to 1971 model years; and (3) one report dealing with the purported interference by a foreign object *1060 with the steering relay rod in a 1973 Chevrolet Vega. The trial court ruled that these reports were admissible to show notice and knowledge of a defective condition on the part of GM, provided that the reports contained the signature of a General Motors Corporation employee or an employee of a GM dealership. The reports were not admitted as evidence of proof of a defect in the Landry vehicle.
Appellant, GM, asserts the following specifications of error:
1. The reports are hearsay and do not fall within any of the exceptions to the hearsay rule.
2. The reports should not have been admitted because they were irrelevant.
3. The prejudicial effect of the documents outweighed their probative value.
4. The trial court, once it allowed the complaint reports to the NHTSA to be introduced, should have allowed the favorable results of the NHTSA's investigation to also be introduced.
There is no question that written documents are ipso facto hearsay. The issue, however, is whether these documents fall under the business records exception to the hearsay rule which has been recognized by Louisiana Courts. It is sufficient to show as a basis for receipt of such evidence that certain conditions have been met; (1) they are permanent, regularly kept records; (2) the record was made within a reasonable time after the occurrence of the event; and (3) the information was furnished by one having a business duty to report or record the event in the regular course of business. The burden rests upon the mover to meet these conditions precedent to the admission of the documents. Ziemba v. City of New Orleans, 411 So.2d 697 (La.App. 4th Cir. 1982). The purpose of these criteria is to assure that in all probability the evidence is trustworthy. The reports introduced in the instant case do not have this indicia of reliability because there is no evidence in the record that plaintiff-appellee met the conditions precedent to establishing the reliability of the reports. On their face, the reports purport to represent consumer complaints made originally to employees of new car dealerships who in turn passed the information along to GM. Neither the consumer, dealership employees nor Cadillac personnel were present in Court to identify the documents. No evidence was introduced to show how the reports were prepared, when or by whom. Nor did plaintiff present any evidence that the information contained in the documents accurately reflects the original complaints. Because their authenticity was not shown at trial, the reports do not fit under the Business Records exception to the hearsay rule and should not have been admitted. Because we have found error in the admission of the documents without the proper foundation, it is not necessary to address the other specifications of error regarding this issue.

REMAND
As noted in the beginning of this opinion we have decided to remand this case in accordance with the principle set out in Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980). In Ragas, the court in a well reasoned opinion authored by Justice Ad Hoc Federoff sought to clarify its holding in Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975). Gonzales held that when an appellate court has before it the entire record, a trial judge's erroneous instruction to the jury does not warrant a remand. Rather, the appellate court should, in the interests of judicial economy, decide the case on the merits, relying on its constitutional authority.
Prior to Gonzales, several appellate courts, including the Supreme Court, had remanded rather than decide jury cases in which substantial errors of law had interdicted the findings of fact. See Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (La. 1969); Herbert v. Travelers Indemnity Co., 193 So.2d 330 (La.App. 4th Cir.1966).
In Gonzales, the Supreme Court reversed its holding in Bienvenu, and rejected the argument that a litigant's statutory right to a trial by a properly instructed jury was violated by an appellate court deciding such cases on the merits.
*1061 Realizing that the harsh application of Gonzales in every case would not serve the interest of substantial justice, Ragas[8] gives a more flexible approach in determining whether to remand a case or decide it on the merits where a finding of fact is interdicted because of some legal error implicit in the fact finding process.
The court in Ragas, held that:
"Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales, should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first hand view of the witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial." Ragas v. Argonaut Southwest Ins. Co., supra at 708.
In the instant case, a review of the record convinces this Court that the weight and credibility of the expert witnesses on both sides are nearly equal. The testimony of the plaintiff is of importance in linking the cause of the accident to the conclusions of the experts. Because of the reasons set forth above, we feel that this is precisely the type of case which dictates a remand. Were we not faced with the issue of the hypnotically induced testimony of plaintiff, perhaps a remand would not be required for the other errors discussed herein.
Accordingly, the judgment rendered below is hereby set aside, and this matter is remanded for further proceedings consistent with this opinion.
WARD, Judge, concurs.
I concur in the decision of the majority, the judgment must be reversed; and I agree, this case must be remanded for retrial. It is not one that can be decided in the appellate courts because the error goes to the credibility of witnesses and bears directly on the fact finding function of the trier of fact, in this case the jury.
I understand the majority to sanction the admission of a witnesses's testimony that has been refreshed by hypnosis, believing that hypnosis is merely another way to refresh the memory. The majority readily concedes the dangers of the use of this refreshed testimony, and therefore it lays out what it believes to be adequate safeguards for its use, requiring a foundation to be laid before the testimony may be heard by the trier of fact. The majority also feels that if the testimony is admissible cross examination will adequately protect the opposing parties and that the jury can properly evaluate and assess proper weight or credibility to the testimony. I disagree.
I believe that the testimony should be excluded because it is too unreliable. I fear that the jury will be unable to distinguish between what testimony is the product of a refreshed memory and what testimony has been induced and suggested by hypnosis. I concede that other cases cited by the majority support its conclusion, but there are an equal number that support the conclusion that this testimony should be excluded, and in my opinion, they are more persuasive. I am particularly impressed by the reasoning of the Fifth Circuit Court of Appeal in State of Louisiana v. David Brian Culpepper, supra, which led that Court to conclude that any portion of a witnesses's testimony that has been refreshed by hypnosis is not admissible under any conditions. And like the Fifth Circuit, I agree with the California Supreme Court, People v. Shirley, 31 Cal.2d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (Cal.1982).

*1062 1. Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to wit, that the attention of the subject is wholly focused on and directed by the hypnotist. The suggestions may take the form of explicit requests or predictions by the hypnotist; or they may be inferred by the subject from information he acquired prior to or during the hypnotic session, or from such cues as the known purpose of that session, the form of questions asked or comments made by the hypnotist, or the hypnotist's demeanor and other nonverbal conduct. The suggestions can be entirely unintendedindeed, unperceivedby the hypnotist himself. (footnote omitted)
2. The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to these suggestions, and hence to produce the particular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in "age refression" or under direct suggestion of heightened memory ("hypermnesia"), he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a "memory" of the event that may be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ("confabulations") unconsciously invented to fill gaps in the story, and (4) conscious liesall formulated in as realistic a fashion as he can. (footnote omitted) The likelihood of such self-deception is increased by another effect of hypnosis, i.e., that is significantly impairs the subject's critical judgment and causes him to give credence to memories so vague and fragmentary that he would not have relied on them before being hypnotized. (footnote omitted)
3. During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity. (footnote omitted)
4. Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect. This effect is enhanced by two techniques commonly used by law hypnotists: before being hypnotized the subject is told (or believes) that hypnosis will help him to "remember very clearly everything that happened" in the prior event, and/or during the trance he is given the suggestion that after he awakes he will "be able to remember" that event equally clearly and comprehensively. (footnote omitted) Further enhancement of this effect often occurs when after he returns to the waking state, the subject remembers the content of his new "memory" but forgets its source, i.e., forgets that he acquired it during the hypnotic session ("posthypnotic source amnesia"); this phenomenon can arise spontaneously from the subject's expectations as to the nature and effects of hypnosis, or can be unwittingly suggested by the hypnotists instructions. Finally, the effect not only persists, but the witness' conviction of the absolute truth of his hypnotically induced recollection *1063 grows stronger each time he is asked to repeat the storey; by the time of trial, the resulting "memory" may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability. (footnote omitted) (Id. 181 Cal. Rptr. at 270-71, 641 P.2d at 802-04.) The safeguards the majority attempts to provide are simply not adequate to protect against the dangers inherent in the use of such testimony.
I find the reasoning of the majority distinguishing civil from criminal cases to be singularly unpersuasive. Constitutional rights of confrontation and cross-examination are not the exclusive province of criminal cases.
Since I would reverse and remand, I concur. But I also disagree with the majority view that the Trial Court committed error when the Trial Judge struck "foreseeably" from the interrogatories. Although I agree that "foreseeable", meaning anticipated, is an important ingredient of a products liability case, it is not essential in answering the question of whether the defect presents an unreasonable risk of danger. The majority confuses the question of whether there existed an unreasonably dangerous defect with the question of whether the injury might reasonably have been anticipated, (foreseeable).
In my view under Weber, Hunt, De-Battesta, Hingle, and others the test for products liability may be summarized to have four elements. First, the product must have a defect which presents an unreasonable risk of danger to its purchaser or others, and this risk must be more than an average consumer would accept when purchasing it. Second, the product must be used in a normal manner. Next the defect must be the cause in fact of the accident. Finally, the injury that was caused by the defect must be one that could have been reasonably anticipated, or stated in other words, one that was reasonably foreseeable to occur because of the defect.
In the instant case, the interrogatory was directed to the question of whether the Vega automobile was manufactured with a defect that was unreasonably dangerous when the automobile was in normal use. Foreseeability plays no essential part here, although it does in limiting recovery when deciding what injuries are compensible: Only those that may be reasonably anticipated or which are foreseeable. At worst, use of "foreseeable" was redundant.
I do not believe the Trial Judge erred in this instance.
NOTES
[1] The leading cases excluding hypnotically induced testimony are People v. Shirley, 31 Cal. 3rd 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982); People v. Gonzales, 329 N.W.2d 743 (Mich. 1982); State v. Mack, 292 N.W.2d 764 (Minn. 1980); State v. La Mountain, 125 Ariz. 547, 611 P.2d 551 (1980).
[2] The leading cases requiring strict guidelines for a foundation are State v. Hurd, 86 N.J. 525, 432 A.2d 86 (N.J.1981); State v. Beachum, 97 N.M. 682, 643 P.2d 246 (N.M.1981).
[3] State v. McQueen, 295 N.C. 96, 244 S.E.2d 414 (1978); Chapman v. State, 638 P.2d 1280 (Wyo.1981); Clark v. State, 379 So.2d 372 (Fla. App.1979).
[4] Kline v. Ford Motor Co., Inc., 523 F.2d 1067 (9th Cir.1975); Connolly v. Farmer, 484 F.2d 456 (5th Cir.1973).
[5] The qualifications of Dr. Orne are quite impressive, and although they are not listed herein, we are convinced he is a recognized leader in the field of hypnotism. Also, we note that his expert testimony has been used in cases researched by this Court, and in particular State v. Hurd, supra, footnote 2.
[6] In State v. Tharp, 284 So.2d 536 (La. 1973) our Supreme Court set forth similar requirements with the use of past memory recorded and present recollection revived. Those requirements were necessary to protect the truth and accuracy of the recollection, just as the requirements set out herein are intended to do.
[7] Procedurally, the trial judge should make a determination outside the presence of the jury that the plaintiff is or is not competent to testify. If it is determined that he is competent, then the same foundation should be presented in the jury's presence before proceeding with his testimony.
[8] The rationale in 41 Tul.L.R. 922 authored by this writer supports the Ragas decision to remand.