GLADNEY, Judge:
This action ex delicto was brought by-Mrs. Gertie Mae Brooks, individually and as tutrix for her minor daughter, Penny Brooks, who sustained injuries on July 28, 1962 about 2:30 P.M. when the automobile in which she was riding as a guest passenger skidded out of control and struck a bridge abutment about twelve miles south of Ruston on U. S. Highway 167. Liability for the resulting damages is charged against, first, Claude T. Kirkpatrick, whose minor son, Tommy, was the driver of the vehicle involved, and the liability insurer of the automobile, Audubon Insurance Company, and second, Raymond F. Peterson, a logging contractor, and his insurer, Travelers Insurance Company. All defendants have appealed from a judgment rendered in favor of plaintiff. The latter has answered the appeal for an increase in the award.
At the time above stated Tommy Kirkpatrick and his companions, Penny Brooks, Carolyn Pratt and Tom Powers were on their way to a swimming hole near Quit-man. The Kirkpatrick automobile which Tommy was driving was traveling southerly on U. S. Highway 167 and approaching a highway bridge across Big Cypress Bayou. Just prior to reaching the bridge the automobile overtook a truck traveling somewhat slower and young Kirkpatrick attempted to execute a passing maneuver. It was while endeavoring to complete the act of passing and returning to the southbound traffic lane of the highway that the car went out of control.
U. S. Highway 167 is a heavily traveled thoroughfare for traffic running north and south between Arkansas and Louisiana. It is a two-laned highway, the surface of which is 24 feet wide with asphalt overlay. Its shoulders are comparatively narrow. For some distance on either side of the bridge the road is level and straight. The area in the vicinity of the bridge is swampy, the soil for the greater part being what is described as “gumbo”. About 600 feet south of the locus of the accident, or 500 feet beyond the opposite end of the bridge, a dirt road enters the highway from the west side. During the months of June and July this road was in almost daily use by Raymond F. Peterson who was conducting logging operations requiring delivery of the logs via U. S. Highway 167 northward to El Dorado. At the time of the commencement of the operations, a wooden ramp was constructed of two inch by twelve inch wooden planks which ramp led from the logging road at the edge of the woods to the surface of the highway, a distance of 50 or 60 feet.' The evidence indicates that on occasions the dirt roads and woods were wet from rain and when the logging trucks came out of the woods and headed north, deposits of mud were made on the highway. Shortly prior to the occurrence of the accident there was a summer shower which caused the surface of the highway to be wet.
Plaintiff’s cause of action is predicated on the joint and concurrent negligence of the owner or operator of the automobile and of the logging contractor. The driver is charged with: Proceeding at an excessive rate of speed in view of the hazardous condition of the highway and the rainy, cloudy weather; operating the vehicle with defective slick tires especially considering the slippery condition of the wet highway, and, failing to maintain a proper lookout and keep the vehicle under proper control.
Peterson and his employees are charged with negligence: In creating a dangerous and hazardous condition upon said highway by depositing thereon mud, clay and dirt, and, in failing to remove the excessive amount of dirt, mud and clay from the highway and warn the public traveling at the point and place where the accident oc *344 curred of the dangerous condition of the highway.
By way of defense Kirkpatrick denies that he was guilty of any negligent act that was a proximate cause of the accident and that sole liability therefor rests with Raymond F. Peterson. Similarly, Peterson denies there existed any muddy condition on the highway that proximately contributed to the occurrence of the accident. Also seriously argued on behalf of Peterson is that statutory responsibility for warning the public of a dangerous condition of the highway rests with the Department of Highways. Each group of defendants has pleaded specially the contributory negligence of Miss Penny Brooks.
Shortly before reaching the north end of the bridge Tommy Kirkpatrick was traveling at a rate of speed which he estimated to be about 45 to 50 miles per hour. It was raining at the time and the windshield wipers of the car were operating. He was overtaking a truck and observed no meeting traffic. He decided to make a passing maneuver and for this purpose accelerated his car to a speed which he said was approximately ten or fifteen miles faster than the truck. Counsel for appellee contends the passing speed of Kirkpatrick was in excess of 60 miles per hour and, whether that fast or not, it is argued that with consideration of the dangerous condition of the wet road the speed of, the automobile was excessive. Miss Brooks, who was seated to the right of the driver, estimated the passing speed as being in excess of 60 miles per hour. Carolyn Pratt and Tom Powers were seated on the back seat and it is apparent their testimony is more or less speculative as to the speed of the automobile during the passing maneuver.
The record is far from clear as to the specific cause of the accident. It is manifest from the testimony of Tommy Kirkpatrick that immediately after the accident he could assign no specific reason for the car getting out of control. It was not until a day or so later that he reached the conclusion that mud had become a contributing factor causing the car to skid out of control.
H. A. Thomas of the State Police, a veteran trooper with 16 years service, following an interview with Tommy Kirkpatrick stated the latter informed him at the hospital that when the right front wheel of the-car went off the blacktop pavement he pulled back, “swerved to the line”, and the right side of the car went into the bridge. It is significant that on this occasion Tommy Kirkpatrick made no mention of the muddy condition of the highway as a cause of the car skidding. Trooper Thomas testified he located marks made by the vehicle where the wheel went off the shoulder and skidded for a distance of about 20 feet. This was close to the bridge. Unquestionably in our opinion the accident would have been avoided in all probability had the car been going at a much slower rate of speed which would have increased the degree of control on the wet and naturally slick asphalt highway.
The general rule well respected in our jurisprudence is that the occurrence of an accident does not raise the presumption of negligence but, where the testimony which proves the occurrence by which the plaintiff was injured discloses circumstances from which the defendant’s negligence is a reasonable inference a case is presented which calls for defense. The defense tendered on behalf of appellants Kirkpatrick and his insurer is that the defendant Peterson was guilty of negligence in creating a. muddy condition on the highway which caused the automobile to skid out of control. The evidence however establishes the negligence of Tommy Kirkpatrick due to. excessive speed under the circumstances then existing. Appellee further charges-it was negligent for the automobile to be operated with its right rear tire in a defective condition in that the tread had been-so worn it was virtually non-existent. It was admitted by Tommy Kirkpatrick that-he had rotated his tires in Baton Rouge shortly before making his trip to Ruston- and had placed the worn tire on the right. *345 rear of the vehicle. Counsel argue that with this knowledge Tommy Kirkpatrick •operated the car without regard to the safety of the occupants of his car and the trav•eling public, by proceeding down a rainy highway at an excessive rate of speed. It is, of course, reasonable to infer that a tire without tread is dangerous when operated on a wet asphalt highway at an ■excessive rate of speed. This is not to say that the speed of the car was the only proximate cause of the accident for there ■remains the question of whether Peterson •also was at fault in depositing an excessive ■quantity of mud upon the highway and thereby creating a dangerous condition. This fact is controverted but if proven it would merely he a concurring and additional proximate cause of the car going out of control.
A number of witnesses testified as to the presence of mud on the highway. As previously stated, Tommy Kirkpatrick did not observe any undue condition of mud or dirt on the surface of the highway during the passing maneuver. State Trooper H. A. Thomas who arrived at the scene of the .accident slightly more than an hour after its occurrence, testified that he inspected the highway without finding any more than the •ordinary amount of mud and dirt on the surface of the highway, not enough to be •dangerous,' and not enough to incorporate in his report. His testimony was corroborated by State Trooper Billy Walker who .assisted Thomas in the investigation. A very short while after the accident Joe M. Richardson, Jr. and James Boyd who were enroute to a Jaycee picnic arrived and immediately undertook to give assistance to the injured persons and to call for an ambulance. In addition to these M. W. Anderson, L. D. Napper and others testified as to the presence of mud or dirt on the highway. None could say whether it was so excessive as to constitute a source of danger. The condition was described as affecting all of the highway and extending as far as 250 feet north of the bridge. More was observed south of the road where the point of ingress to the highway was had by the logging trucks. Careful examination of such testimony discloses that the recollections of these witnesses were for the most part vague and indefinite. None saw the large glob of red mud as testified to by Miss Penny Brooks. Mr. Napper, Claude T. Kirkpatrick and John McCarter, Jr., the latter a geologist, first visited the scene of the accident after the road had become dry and the prior presence of any clods of dirt or mud pulverized by traffic on the highway. Miss Penny Brooks, however, testified that after Tommy Kirkpatrick passed the truck and began to pull back into the lane he hit some mud and went into a spin. She then testified:
“Q Tell me about the mud that you saw?
“A It was red clay mud.
“Q About how far did the mud extend north of the point of the accident?
“A I don’t know — I saw it then — as I saw the mud, we really went into a spin, and I really wasn’t seeing how much mud was there.
“Q You had not seen the mud before you went into the spin?
“A Yes, I had noticed the mud as we were pulling in.
“Q Did you see the mud before the car was driven in the left passing lane?
“A No, sir.
“Q Was there any mud on the highway before you hit this one glob of mud that you spoke of?
“A I did not see any mud on the highway.
“Q Now, according to your discovery deposition, you said that there was a glob of mud which appeared as if it had fallen off of a log truck, and it was in a lump, is that correct?
*346 “A Well, there was a lump of mud there, you know.
“Q Now, describe this lump of mud— I see your hands, but what did it look like ?
“A Well, I remember seeing this lump of mud — I do not know it’s circumference, it’s diameter — I only know it was a lump of mud — you know when it flashes through your mind and the next instant you are in a very bad car wreck, I don’t remember what the mud looked like.
“Q Well, was it only the one lump of mud that you saw?
“A That I noticed, yes, you see, we had just pulled out by this truck.
“Q Did you see any mud other than this lump or glob of mud?
“A I did not.
“Q Could you estimate the size of that glob of mud?
“A I do not know.”
None of the other occupants of the car observed the glob of mud mentioned by Miss Brooks nor was it otherwise identified. The logging trucks of Peterson operated over the highway through the scene of the accident on almost every day during the month of July, 1962, and did operate every day from July 18 through July 31. These vehicles entered the highway at a point 500 feet south of the south end of the bridge. The defendant Peterson earnestly contends that no dangerous condition was caused by the mud and that there was no red clay such as described by Miss Brooks that could have been deposited by the logging trucks which were operating in a dark gumbo or craw-fish type of soil. Mr. McCarter, a geologist, testified as to examinations of samples of dirt taken from the highway and these were disclosed as being grayish which when wet would appear as the same color of the asphalt overlay on the highway.
Proof that mud or dirt deposited on the highway by agents or employees of Peterson has not been made out. We think plaintiff has failed to show by a preponderance of the evidence that mud was a proximate cause of the loss of control of the automobile. Miss Brooks may have been, mistaken as to seeing a glob of red clay or mud, but, assuming the presence of such mud, there is no substantial evidence to connect it with the logging trucks. It well may have dropped from some vehicle that had accumulated the mud from a dirt road where red clay was present. Certainly there is no evidence of red clay in the area where the logging trucks were workings For these reasons we find that the trial court was in error in its resolution that Peterson and its insurer were guilty of actionable negligence.
The pleas of contributory negligence directed towards appellee are without merit. The loss of control of the vehicle occurred so instantaneously no reaction time could have been sufficient under the circumstances. We deem it unnecessary to discuss the defense tendered by appellant Peterson to the effect that the statutory liability for warning motorists rests upon the Department of Plighways. Although we have determined that plaintiff’s claim has not been made out against Peterson, we have no doubt that he, as any other individual, would not be relieved of liability for their acts, of negligence arising under LSA-C.C. Art. 2315.
In awarding damages the trial court rendered judgment in favor of Mrs. Gertie Mae Brooks for special damages for $6,269.44, and as natural tutrix for Penny Brooks for general damages the sum of $20,000.00 Counsel for appellee through answer to the appeal has asked that the award for Penny Brooks be increased to the sum of $30,000.-00 or to a total of $36,269.44. Appellants contend the trial court was in error in making excessive awards for damages, both special and general.
*347 The first objection is leveled at an award of $1,000.00 for future medical expenses. This finding was not supported by probative evidence indicating that in all probability such expenses will be incurred as can be directly related to conditions caused by or related to the accident. The rule is that speculation and conjecture cannot support such an award. Johnston v. Peerless Insurance Company, La.App., 159 So.2d 415 (2nd Cir.1963) ; Smith v. Aetna Casualty & Surety Company, La.App., 128 So.2d 235 (2nd Cir.1961) ; Carhee v. Scott, La.App., 104 So.2d 236 (2nd Cir.1958).
 After examination of the supporting evidence we make the further observation that the award for such damages should be further reduced by the sum of $78.25 resulting from inclusion of an item of $75.00 for personal effects in lieu of $25.00 in accordance with a stipulation,, and $28.25 for shampoos which we do not regard as an expense chargeable to the accident. The sum of 40 cents which was omitted through error should he added to the award. Thus the total for all special damages is fixed at the sum of $5,188.15.
As a result of the crushing type of accident in which she was involved, Penny Brooks unquestionably sustained severe shock, emotional strain and anxiety to an unusual degree. She incurred multiple abrasions, contusions and bruises about the head, arms and body. Her most serious injury was to the bony structures of the pelvis which were fractured in several places. When first admitted to the hospital she had lost a considerable amount of blood ■occasioned by the fracturing of the pelvis and required transfusions in order to restore blood pressure. She remained in the hospital from July 28 until her discharge on crutches on October 10, 1962. During this period she suffered from constant severe pain. Fortunately the bruises and contusions were of a minor nature and healed uneventfully.
Counsel for appellee has directed our most serious consideration to the potential permanent effect of Miss Brooks’ injuries, with particular reference to the ability to have normal childbirth, whether or not one of the legs was shortened, and whether the multiple fractures of the pelvic structure would result in an arthritic condition. A further concern is the question of whether a prior epileptic condition has been aggravated or worsened by reason of the trauma.
Miss Brooks was under the treatment of Dr. Lamon C. Bleich and Dr. Robert W. Sharp from the time of her entrance to the hospital on July 28 until her discharge on October 10, 1962. Dr. Sharp continued to treat the patient until May 23, 1963. As we understand the nature of the services rendered, Dr. Bleich, physician and surgeon served as an internist and Dr. Sharp particularly attended to the neurological aspects of the case. After the initial set of x-rays were taken on July 28, Dr. Roy H. Ledbet-ter, Jr., an orthopedic specialist of Monroe, was called in. He made professional visits to the Ruston Clinic on July 1, August 14 and September 25. These doctors, together with Dr. Edward J. Brown of Monroe, a specialist in obstetrics and gynecology, agreed that as of the date of their depositions the fractures of the pelvis had normally healed with the exception that the inferior ramus of the right ichium appeared to have been distorted so that the right side of the pelvis was slightly converted or displaced. It was this irregularity or abnormality which prompted an inquiry as to whether the healed condition of the pelvis would permit normal childbearing. Dr. Bleich testified that the answer to this question was speculative in that Penny Brooks could possibly have some trouble and on the other hand it may never result in any handicap. He also testified to a reasonable possibility that she would suffer intermittent pain for the remainder of her life as a result of the distortion of the pelvis hones. Dr. Ledbetter expressed the opinion that he found no significant abnormal condition which would affect normal childbirth. He did say that it was a reasonable possibility that as a residual of the fracturing an *348 arthritic condition would at some future date cause mild intermittent pain. Dr. Led-better testified he could not find where either of Miss Brooks’ legs had been shortened. Dr. Brown made a complete examination of Miss Brooks on April 12, 1963 and testified as to his findings. He reported that all of the pelvic organs were normal and gave assurance of normal pregnancy. With particular reference to the pelvic bony structure he found the entire side of the pelvis slightly distorted or converted but that this was not significant and would not interfere with and prevent normal delivery during childbirth. In concluding his testimony he stated that he did not think she would have any problems other than anyone else would.
Dr. Robert W. Sharp had treated Miss Brooks for a form of epilepsy which he termed idiopathic. This treatment was started in 1960 at which time Miss Brooks was 15 years of age. The symptoms of this condition are manifested in the right leg by a jerking movement. Such attacks occurred two or three times per week prior to the accident and Dr. Sharp felt that the condition was under reasonable control as a result of the medical program being used. Following the accident no change was noticed in this condition for two or three weeks. After that Miss Brooks, her mother and a nurse reported to the doctor that the attacks had increased. Dr. Sharp testified he had not been in a position to confirm an increase in the attacks but he accepted the complaints as being correct. In order to relieve some of the severe pain suffered by Miss Brooks it was necessary to alter the medical program in treatment of the epileptic condition. Questioned as to whether or not such an increase in the attacks had resulted from the trauma experienced by the patient, Dr. Sharp said he was of the opinion they could have been caused from emotional trauma or as a result of the change of the medical program. Mrs. Brooks became concerned over Penny’s condition and, after consultation with Dr. Sharp, it was decided an examination and evaluation of Penny’s condition should be made at the Mayo Clinic where she had previously been-examined and a course of treatment prescribed. During the first few days of December 1962 a full and complete examination was made at the Mayo institution. During’ the examination by Dr. Robert E. Yoss, Penny Brooks submitted to a spinal fluid' test and a pneumoencephalogram, but with-negative results. Miss Brooks said this test was the most painful experience she had ever had. In his report on the examination Dr. Yoss .said that emotional' trauma and changes in the medical program could have brought about an increase in the-frequency of seizures. However his conclusion was: “I do not believe that the-accident had any effect on the basic cause of the seizures and that any worsening of' the seizure disorder was of a temporary-nature.” The last examination of Dr.. Sharp was on May 23, 1963. In response to-a question as to whether his findings suggested any permanent increase in the seizures his answer was no. Doctors Yoss and' Sharp were of the opinion any worsening-of Miss Brooks’ condition was only temporary and she would not be permanently affected as a result of the accident.
After a review of the evidence relating to-the injuries sustained by Miss Brooks, we-find that her prognosis is good and no permanent effects should be anticipated except, for a reasonable possibility that she will experience intermittent pain to a mild or moderate degree resulting from the displacement or distortion of the right side of the pelvis and the possibility of being subjected to a mild condition of arthritis. Other physical and neurological conditions which did or may have developed from the accident have not caused any significant change.
For the above reasons the award', made in favor of Miss Brooks should be reduced to the sum of $15,000.00 which' amount we believe to be adequate compensation for the injuries and pain and suffering which she has endured and may endure-in the future.
*349 Accordingly, it is ordered that the judgment in favor of Mrs. Gertie Mae Brooks, individually, and as Tutrix for Penny Brooks, against Raymond F. Peterson and Travelers Insurance Company be and the same is hereby annulled, set aside and reversed, and the demands of plaintiff against these defendants are dismissed. It is furthered ordered that the judgment in favor of Mrs. Gertie Mae Brooks, individually and as natural Tutrix for the Minor, Penny Brooks, against Claude T. Kirkpatrick and Audubon Insurance Company be amended by reducing the amount awarded in favor of Mrs. Gertie Mae Brooks, individually to the sum of $5,187.24, and the amount awarded in favor of Mrs. Gertie Mae Brooks, as Tutrix for the Minor, Penny Brooks, be reduced to the sum of $15,000.00.
Costs of this appeal are taxed one-half against appellee and one-half against appellants, Claude T. Kirkpatrick and Audubon Insurance Company. As so amended the judgment is affirmed.