443 So.2d 1139 (1983)
Joseph N. LANDRY
v.
BILL GARRETT CHEVROLET, INC., et al.
No. 13217.
Court of Appeal of Louisiana, Fourth Circuit.
December 9, 1983.
Writ Denied February 10, 1984.
Reconsideration Denied March 9, 1984.
*1141 Val A. Schaff, III., Schaff & Currier, New Orleans, for appellee/plaintiff.
Gerald M. Dillon, Dillon & Cambre, New Orleans, for defendant/appellant Bill Garrett Chevrolet, Inc.
Peter L. Bernard, Jr., Joseph S. Palermo, Jr., Bernard, Cassisa, Babst & Saporito, Metairie, for defendants/appellants General Motors Corp. and Royal Globe Ins. Co.; Otis M. Smith, General Counsel, William J. Kemp, Jr., Nicholas J. Wittner, General Motors Corp., Detroit, Mich., of counsel.
Before LOBRANO and WARD, JJ., and G. WILLIAM SWIFT, JR., J. Pro Tem.

ON REMAND FROM THE SUPREME COURT
LOBRANO, Judge.
In our original opinion in this matter we held that a foundation must be laid prior to the introduction of hypnotically induced testimony. We also held that the trial court erred in deleting the word foreseeability from its charge on product's liability and erred in admitting into evidence certain consumer complaints filed against General Motors concerning power steering problems in other vehicles. Landry v. Bill Garrett Chevrolet, Inc., et al, 430 So.2d 1051 (La.App. 4th Cir.1983). Because we felt that the hypnotism issue posed serious problems of credibility, we remanded the entire matter to the trial court in accord with the pronouncements of Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980). We did point out, however, in the conclusion of our opinion that "(W)ere we not faced with the issue of the hypnotically induced testimony of plaintiff, perhaps a remand would not be required for the other errors discussed herein." Landry, id. at 1061.
On application for writs of review by both the plaintiff, Landry, and one defendant, Bill Garrett Chevrolet, Inc. our Supreme Court held:
"Granted. The ruling of the Court of Appeal concerning the hypnotically-enhanced testimony is reversed, and the case is remanded to the court of appeal to decide on the merits on the record before it." Citing Gonzales v. Xerox, 320 So.2d 163 (La.1975) Landry v. Bill Garrett Chevrolet, Inc., 434 So.2d 1103, 1105 (La.1983).
In so ruling, we must assume that our Supreme Court is of the opinion that a foundation is not necessary for the introduction of hypnotically induced testimony, and most definitely such testimony is not to be precluded as a matter of law as suggested by Judge Ward in his separate concurring *1142 opinion.[1] With this ruling in mind, we now proceed to decide the merits of this appeal.
For the sake of continuity and clarity we shall restate the factual events leading to this action.
Plaintiff, Joseph N. Landry, (Landry), instituted these proceedings against defendants, Bill Garrett Chevrolet, Inc. (B.G.C.) and General Motors Corporation (GM) seeking recovery for personal injuries received in an automobile accident that occurred on July 20, 1976. The claim against B.G.C. is based on negligence, and the claim against GM is based on product's liability. After a trial by jury, plaintiff was awarded damages in the amount of $1,948,547.00 against both defendants in solido. From this judgment both defendants have perfected this appeal. Plaintiff answered the appeal seeking an increase in the award.
On November 18, 1975, Landry and his wife, purchased a new 1975, Chevrolet Vega "Hatchback" from B.G.C. The automobile was for the principal use of Mrs. Landry, and was operated by the plaintiff on only one or two occasions. On the sixth week following the purchase of the vehicle, Mrs. Landry testified she experienced a problem with the steering of the automobile. She stated that on making a right turn into a driveway, the steering wheel in the automobile turned freely; made complete circles without having engaged the wheels of the automobile. She stopped the vehicle and turned the steering wheel until such time as the wheels did engage and responded to turning direction. She proceeded immediately to B.G.C. and made a complaint about the steering system. She further testified that she experienced the same phenomenon a second time on May 27, 1976. At that time, she was turning off Interstate 12 onto the service road connecting with Interstate 10, when somewhere in the middle of the road, she again experienced free wheeling of the Vega automobile. She stopped the vehicle, flagged down a motorist, requested him to contact her daughter and to have her pick her up at B.G.C.'s place of business. She returned to the automobile and turned the steering wheel until such time as she was able to control the direction of the vehicle. She again went directly to B.G.C. by use of the emergency lane of the I-10 system, and upon arriving at the dealer's place of business, again, gave a complaint about the steering system.
On July 20, 1976 while driving the Vega for the first or second time, plaintiff sustained severe injuries when the vehicle crashed into the road divider and overturned at a point west of the crest of the I-10 bridge over the Industrial canal. Plaintiff's version of the facts of the accident as testified by him at trial, are basically as follows: Upon leaving his home in Slidell and arriving at his daughter's home on Chef Menteur Highway, he experienced no difficulty with the Chevrolet Vega. He then left his daughter's home sometime after 9:00 A.M. and while proceeding onto Chef Menteur to its access with the I-10, he experienced no difficulty with the automobile. Upon making a sweeping right-hand turn from Chef Menteur onto the access road of the I-10 system, he stated he felt some odd sensation with the steering of the Vega. He did not know what had occurred, but at some point when he tried to correct or steer the vehicle to the right, he felt that the steering wheel had locked and that he had no control whatsoever. Mr. Landry continued driving the automobile, struggling with the steering wheel to correct the drift of the car, to keep it in the center lane of traffic, but was unsuccessful. From the time he noticed the locking of the steering wheel until he got beyond the crest of the bridge, the automobile had drifted from the center lane of traffic to the left hand lane of traffic. *1143 At some point west of the crest of the bridge, the automobile impacted into the road divider and turned over causing his injuries and a total loss of the automobile itself. This suit followed wherein judgment was rendered against GM and B.G.C., in solido, for $1,948,547.00.
For the following reasons, we reverse that judgment as to the liability of B.G.C., and affirm same as to GM, but with a reduction in the award.
Liability of General Motors
Louisiana law on products liability is best expressed by our Supreme Court in Hunt v. City Stores, Inc., 387 So.2d 585 (La. 1980), as follows:
"Thus, under Weber [v. Fidelity and Casualty Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754], the plaintiff in a products liability suit must only prove that the product was defective, i.e. unreasonably dangerous to normal use; that the product was in normal use at the time the injury occurred; that the product's defect caused his injury, and that the injury might reasonably have been anticipated by the manufacturer." Id. at 589.
Plaintiff testified that at or prior to going over the bridge above Chef Menteur Highway, his vehicle started edging slowly toward the left, and he was unable to turn it to the right. He described the problem, initially as "some odd sensation with the steering". Eventually, after entering the interstate, plaintiff realized the sensation was a lock up of the steering and that he had no control whatsoever. The vehicle went from the center lane to the left lane, hit the divider and overturned.
Plaintiff alleges three theories as to the cause of the steering lockup. First, the spacing between the relay rod and the K-braces is such that a foreign object such as wood, rock, or other debris could become lodged thus jamming the steering. Second, there was foreign, metallic particles in the power steering system itself thus causing a lockup of the unit. Third, the adjuster plug was not properly bottomed, thus causing the worm gear to move in and out as it was rotating. This, he alleges caused a mechanical jamming, as opposed to a hydraulic locking. In support of these three theories, plaintiff relies on several experts. After a thorough review of all their testimony, the plaintiff's case is best summarized by the conclusion of Dr. Brenner, who stated:
"It is an absolute certainty in my mind that there was steering lock up and that it was caused by one of three conditions, one being the steering relay rod problem. Another being the two issues associated with the steering gear. That is an absolute certainty in my mind."
* * * * * *
"I cannot say which scratch, which problem with the adjuster plug, which problem with the steering relay rod caused it, but everything which I have examined is completely consistent, nothing is counter to the conclusion that steering lock up occurred, that one of these factors caused the lock up ..."
Basically, plaintiff's theory in this case is very similar to that expressed in the Second Circuit case of Hunt v. Ford Motor Co., 341 So.2d 614 (La.App. 2nd Cir.1977). That case involved an alleged steering lock up also, wherein the Court stated:
"It is not necessary for the plaintiff to prove the precise nature of the defect only that a manufacturing defect existed and that it caused the accident. While there is no expert testimony pinpointing the defect, the defendant's expert evidence... does not negate the possibility of a defect which could have caused the steering wheel to hang up or freeze to a degree which could have caused Mrs. Hunt's car to run off the road while in a passing manuever. The evidence of a manufacturing defect in the steering mechanism which caused the accident is sufficient to support the jury verdict." Id. at 618.

Plaintiff's theories were supported by the following testimony.
Dr. Lawrence Daniels, a mechanical engineer, testified that in his opinion "... something could have gotten caught between *1144 the relay rod and lower portion of the frame." This would have made it most difficult to steer. He studied the blueprints of the suspension system on the Vega and concluded that where the relay rod passed between the oil pan and the frame, there was a clearance of about .63 inches. Further there was a distance of 7/8" to 1" between the rod and frame. He further testified that the photographs taken on May 28th and 29th 1980 indicated that at some time the relay rod had hit the oil pan as noted from a visible dent in same. Dr. Daniels' testimony can best be summarized as follows:
"I'm not an accident reconstructionist. My opinion is simply that this could have occurred by something getting jammed within the steering mechanism."
He suggested that the manufacturers should have designed a protective device to prevent the possibility of jamming.
Dr. Robert Brenner qualified as an expert in mechanical engineering, traffic engineering and safety engineering. In addition to confirming Dr. Daniels' theory of the relay rod problem, Dr. Brenner suggested two other possible defects. First, he noted from rust marks located on the adjuster plug that it may not have been properly bottomed. This, he says, prevents the valve body and worm gear from operating as a solid shaft. Instead, the worm gear moves in and out (or back and forth) as it rotates. This can cause a mechanical binding of the gears. Other symptoms, including damage to the ballguides, and markings in the spool valve indicate a mechanical binding. Secondly he testified that the hydraulic pump was defective in that it did not provide positive methods to filter foreign material out of the system. The power steering system on the Vega has a magnet as opposed to a filter. Scratches in the power steering gear confirm contamination in the fluid which in turn gets to highly sensitive areas such as the spool valve and into various inlet parts that produces hydraulic binding.
Dr. E.C. Fitch, a professor at Oklahoma State University, testified that he was familiar with the Saginaw Power Steering system. He was qualified as an expert in the field of hydraulic engineering. He was retained to analyze the fluid recovered from the power steering unit after it was disassembled. His testimony reinforced the theory of contaminants in the hydraulic system. The net effect or result of contaminants in the system is a reduced flow of fluid. He went into much detail about the route of the hydraulic fluid in the steering system, and concluded that the contamination problem could be resolved by the manufacturer with the use of a filter. His conclusion was "... this contamination level that is in there, that there is no question that you could have a lock, contaminant lock in that power steering valve." Although he admits that the Saginaw system is designed to continue operating if there is loss of hydraulic assist, conversely if there is hydraulic lock up in the steering check valve, it would be impossible to turn the wheel. You would tear the whole wheel up trying to fight this hydraulic pressure against the check valve.
Opposing plaintiff's theories, GM offered the testimony of Dr. Henry Hicks and Alfred C. Drouillard. Dr. Hicks, who qualified as an expert in mechanical engineering, testified in opposition to the relay rod defect theory. He found no evidence of scratches, gouges or removal of paint which would indicate that something had jammed the relay rod. He discounted Dr. Daniel's observation of the oil pan dent as not being indicative of the lodging of a rock or debris because the nick was covered with oil deposits. In further support of his conclusion, he drove a large wooden stick into the space between the relay rod and cross members of a similar 1975 Chevrolet Vega. He then drove the vehicle through the accident scene. His conclusion was simple, it was not possible for the accident to have occurred because of something being lodged between the relay rod and K-braces or the oil pan.
Alfred C. Drouillard, Staff Project Engineer for the Saginaw Steering Division of General Motors, was qualified as an expert *1145 in the fields of mechanical engineering, automotive engineering, and the design and operation of steering gears and pumps. The thrust of Mr. Drouillard's testimony is that on May 28th and 29th, 1980 (the same time Dr. Daniel examined the vehicle) he removed the power steering system from the Landry vehicle and installed it in a similar 1975 Vega. He then test drove the vehicle with no problems. The day following the test drive, he disassembled the steering gear and pump, and confirmed that there was nothing wrong. In order to further disprove Dr. Brenner's theory of particle lock up he placed a hardened set screw through the steering gear housing so that the screw actually contacted the outside diameter of the valve body. He then test drove the vehicle with no difficulty. He also added contaminants such as metal particles and sludge to a facsimile power steering unit and test drove same through the accident scene at 50 miles per hour with no problem. He thereafter drove the same test vehicle with the added contaminants from New Orleans to Saginaw, Michigan and back to New Orleans. During the trip he experienced only two instances where he could feel a "nibbling" effect in the steering system. This he concluded substantiated his opinion that metal particles are ground up within the steering system.
We expressed the view in our original opinion that the trial court's omission of the word "foreseeability" from its charge on products liability and its admission into evidence of certain reports both were error.[2] We still adhere to that view for the reasons expressed in said opinion. However, we do not deem those errors to be of such a magnitude as to require a total disregard of the jury's findings so as to decide the issue of GM's liability as a matter of first impression. See, Gonzales v. Xerox, 320 So.2d 163 (La.1975). Although Gonzales holds that a court of appeal should not remand but decide on the merits when the entire record is before it, the problem of the manifest error rule is not discussed.[3] That rule, which is deeply entrenched in our law, provides that we are not to disturb the lower court's findings unless "manifestly erroneous". Canter v. Koehring, 283 So.2d 716 (La.1973). Manifestly erroneous means clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). We are not to substitute our own inferences or evaluation when there is a conflict in the testimony, and our review is not completed by reading so much of the record as to substantiate the verdict. There must be a further determination that the record establishes that the finding is not clearly wrong. Arceneaux, supra 1333.
Applying these principles we conclude that the fact finder, the jury, was not manifestly erroneous in finding that plaintiff did in fact have a steering lock up, and that said lock up was caused by a defective steering system designed and manufactured by GM. Although we may have decided either one or both of these issues differently on first impression, we certainly cannot say that the jury was clearly wrong. The experts on both sides are convincing,[4] although obviously conflicting. The jury chose to believe plaintiff's version of the accident, and there is substantial evidence to support it. When there is an issue of credibility, we are to give great weight to *1146 the fact finder's conclusion. We therefore affirm as to GM's liability.
Liability of Bill Garrett Chevrolet, Inc.
The jury found B.G.C. guilty of negligence in failing to discover and/or repair the alleged steering defect in plaintiff's car and that this negligence was a cause in fact of his accident and injuries. As previously noted, the Arceneaux, case, supra, prohibits a reversal of the lower court's factual determination unless it is clearly wrong. A review of the evidence shows that the jury verdict against B.G.C. was in fact clearly wrong.
Before proceeding with a discussion of the claim against B.G.C. it must be kept in mind that plaintiff's allegations against this defendant is based on negligence, not products liability. Therein, we feel, is where the jury went astray. Under Hill v. Lundin, 260 La. 542, 256 So.2d 620 (1972) and its progeny, Louisiana employs a "duty risk" analysis in determining whether a particular defendant is guilty of negligence. This duty risk analysis involves a three prong inquiry.
The first threshold is one of causation. Was there any causal relationship between the harm to the plaintiff and the defendant's alleged negligent conduct? If plaintiff can prove that the action of defendant was a substantial cause in fact of the accident we must then ascertain whether the defendant breached a legal duty imposed to protect against the particular risk involved. Hill supra. In the case at bar plaintiff contends that B.G.C. failed to discover and properly repair the alleged malfunction in the steering mechanism of plaintiff's car, and that said malfunction was the cause of the action. This court is of the opinion plaintiff failed in his burden to prove these allegations.
Mrs. Landry brought the Vega in question to B.G.C. for repairs on two separate occasions. The first was on January 6, 1976. Although Mrs. Landry testified that she brought the auto in after experiencing a "free wheeling" episode while turning into a parking lot, the B.G.C. repair order lists the complaint as a "squeak in the power steering".
On this occasion, the unit was repaired by a B.G.C. mechanic Charles McCullough. McCullough did not find any parts in the power steering unit that were broken. Although he found metal shavings on the magnet and on the walls of the pump housing, the magnet was not covered to an extreme. He then took everything out of the power steering pump, washed it, re-assembled it and put clean fluid in it.
On May 27, 1976, Mrs. Landry again brought the car to B.G.C. after another alleged "free wheeling incident". Again the repair order contrary to Mrs. Landry's assertions makes no mention of any problem in the actual steering of the car, it merely states "check power steering, making noise". The repair work done at this time encompassed only a tightening of the air conditioning and power steering belts.
We note at the outset that the actions taken by B.G.C. on both occasions are consistent with complaints of noises and not "free wheeling" as Mrs. Landry claims. In response to a question proposed to McCullough concerning what work was done on the power steering unit his answer was as follows:
"A. The squeak was in the power steering unit and it was low of fluid was the problem with the car, and the reason it was low of fluid because it kept boiling the fluid out and that was when I had to repair it, repair the power steering unit in the car."
This coupled with plaintiff's testimony that prior to the accident no problems had been encountered with the car lead us to seriously doubt Mrs. Landry's claim of "free wheeling".
Plaintiff does not contend that the actual repairs performed by defendant B.G.C. were done incorrectly. Rather they argue that it was the failure of its mechanic McCullough to comply fully with the provisions of the General Motors shop manual.
That manual provides:

*1147 "If when overhauling a power steering gear or pump, broken component or foreign materials are encountered, the remaining components of the entire hydraulic system should be disassembled, inspected thoroughly, cleaned and flushed before servicing is completed."
B.G.C. argues that under the circumstances it was unnecessary to disassemble the gear and flush out the entire system. Their reasoning is that first, no broken components were found by McCullough, and that secondly, and more over, there were no foreign materials encountered.
Plaintiff contends that metal shavings and dirt constitute foreign particles and thus defendant should have disassembled the remaining components of the entire hydraulic system. Plaintiff's view is contrary to the opinion offered by all of the experts who testified with regard to this phase of the case. All claim that it is normal to have some particles or contaminants present.
Plaintiff's expert, Robert Brenner opined that the steering gear generates its own debris as a result of metal moving upon metal, causing polishing and metal rubbing off moving parts.
Plaintiff's witness Professor Fitch, an expert in the field of hydraulics, analyzed the power steering fluid from the Landry vehicle and stated that the level of contamination was less than normal for a car with the same mileage.
Similarly, Karl Dehn, plaintiff's expert auto mechanic testified that it was normal for small metal particles to be inside the power steering system.
Defendant's experts were in unanimous agreement that metal particles and dirt in the power steering system do not constitute foreign materials necessitating the overhauling of the entire hydraulic system.
Alfred Druillard testified on the intent and meaning of the General Motors shop manual provision in question.
"Q. What does it mean, what does it mean when it says foreign material?
A. Foreign material?
Q. Yes. What does that mean?
A. Foreign material would be broken parts, little veins, pieces of the cam ring, and so forth; maybe a bit from the bearing.
Q. It could be dirt, also, couldn't it?
A. I don't consider dirt to be foreign material. It is indigenous to the system. The system is designed to work with a certain amount of dirt and wear materials in it. We know it is in there; we design it to operate with it in there and do not consider that to be foreign material.
Q. What about metal particles?
A. That is indigenous to the system. We expect to find metal-like particles in the power steering system."
Thus, the conclusion reached by all of the relevant experts was that metal particles and dirt are indigenous to a power steering system and certainly not foreign particles. Since they were not foreign particles, the defendant's failure to dismantle the entire hydraulic system as per the General Motors shop manual did not constitute a breach of duty.
Additionally, plaintiff failed to prove that any alleged omission on the part of defendant was the cause of the accident. Under our holding in Federal Insurance Co. v. Cinnater, 305 So.2d 720 (La.App. 4th Cir.1974) in an action by the owner of an automobile against a repairman, the owner is required to prove (1) that the repairman was negligent in making repairs; (2) that causal relationship existed between negligent repair work and subsequent accident; and (3) that the negligence of the repairman was the proximate cause of the accident.
Focusing on the burden of proof required to carry the causation issue, the court states:
"The general rule is that negligence is never presumed, and that the burden of proving negligence by a preponderance *1148 of the evidence rests on the party alleging it." (citations omitted)
"Negligence may be proved by direct or by circumstantial evidence. A plaintiff relying upon circumstantial evidence, however, must exclude with a fair amount of certainty every other reasonable hypothesis but that the damages claimed resulted in the negligence of the defendant." (citations omitted) Id. at p. 723.
Our exhaustive review of this record leads us to the inescapable conclusion that plaintiff has failed to prove that the actions of B.G.C. in not disassembling and flushing the entire hydraulic system, under the circumstances of this case, constituted negligence. Further, assuming arguendo that B.G.C. is guilty of negligence, plaintiff has still failed to prove that said negligence was a cause in fact of the accident. The burden of proof as to B.G.C. is considerably different from the burden as to GM. We are of the opinion that the jury was in error in finding B.G.C. guilty of negligence. We therefore must reverse the judgment against that defendant.
Quantum
The total jury award was $1,948,547.00. It is broken down as follows:
1) General damages (physical and mental pain suffering and disability)$500,000.00;
2) Loss of income, and impairment of earning capacity, past and future, (discounted to present value)$94,000.00;
3) Medical expenses, past and future (discounted to present value)$1,354,547.00.
After careful review of the record we affirm as to the award for general damages and loss of income and earning capacity past and future and to medical expenses. We reverse as to future medical expenses.
I. GENERAL DAMAGES, LOSS OF INCOME AND EARNING CAPACITY, PAST AND FUTURE
Before an appellate court can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. C.C. Art. 1934(3); Wilson v. Magee, et al, 367 So.2d 314 (La.1979).
There is no question that Landry was severely injured in the accident of July 20, 1976 and that said accident caused his current physical and psychological disabilities.
Two physicians testified on Landry's behalf namely Dr. Moses Wilcox of the United States Public Service Health Hospital and neurologist, Dr. Leon Weisberg. His primary treating physician, Dr. Morris Kloor, did not testify.
Dr. Wilcox treated Landry during his 34 day hospitalization at the Public Service Health Hospital. He (Landry) had been transferred there from New Orleans Charity Hospital on 8/10/76, several weeks following the accident. Dr. Wilcox testified from both Charity Hospital records and from his own personal observations and treatment. He stated that the records of Charity showed Landry had been placed on a breathing machine and a traecheotomy had been performed. Both procedures were necessitated by the multiple fractures sustained to the left side of his chest and ribs. The records also reflected that he sustained multiple fractures of his left clavicle and multiple skull fractures.
Dr. Wilcox's testimony was as follows:
Upon admission to the Public Service Health Hospital, Landry was unable to speak and displayed a great deal of confusion. He had no ability to understand what was said and was unable to express himself. He was unable to feed himself and it became necessary to perform a feeding gastrostoma to insert a feeding tube into his stomach. He had no control of his bladder and bowel functions.
During his hospital confinement, plaintiff was treated with antibiotics for pneumonia, valium for sedation, demerol for severe pain and several other medications for constipation and diarrhea.
X-ray evaluations and other laboratory tests revealed plaintiff suffered severe head injuries resulting in a changed mental *1149 status. In order to try to improve his mental status, he was given physical and occupational therapy. However, he had to continue to be restrained because he remained confused and agitated and had to be prevented from removing the various tubes that had been inserted in his body.
The occupational and physical therapy helped improve his mental status somewhat to where he could control his bladder and bowels and he could walk to some extent.
Upon discharge, the gastrostoma was removed but the incision was bandaged and left open because it was not certain that plaintiff would be able to continue eating on his own. The traecheotomy was closed up and the voice box was again working. However, plaintiff still could not talk as a normal person. He spoke incoherently and often made statements that were totally unrelated to what was asked. After discharge a cat scan was performed which showed plaintiff had atrophy of the brain. After discharge, Dr. Wilcox never again examined Landry.
Neurologist, Dr. Leon Weisberg, examined plaintiff on one occasion approximately one month before trial. Dr. Weisberg's testimony was based on the Charity Hospital records and Public Service Hospital records; two neurological evaluations completed by Dr. Richard Strub of the L.S.U. School of Neurology; historical information received from Mrs. Landry and his own examination of plaintiff.
Dr. Weisberg concluded that from a quiet well-behaved man, Mr. Landry had become a violent person displaying behavior characterized by rage attacks, temper tantrums and an inability to control personality and emotions. His own examination revealed severe damage to plaintiff's higher cognitive brain functions and impairment of his behavior and personality. He found evidence of brain syndrome or dimentia characterized by a significant memory loss for events immediately in the recent past and in the remote past such as remembering the names of objects, where he had recently been, what he had recently been doing, where he was going (in terms of location). He no longer enjoyed the ability to think in abstract terms. As an example, Dr. Weisberg explained that Landry could not remember 3 objects described to him five minutes before. He could not state similarities or differences between objects such as a car and a bicycle, an apple and a pear. Also, there was a marked change in his cognitive functionsthe ability to plan events, to handle his finances, to care for himself, to shop for himself, clean house, etc. In other words, plaintiff no longer had the ability to plan the rest of his life.
Dr. Weisberg further testified that during the examination, at inappropriate times and without provocation, Mr. Landry would break out in uncontrolled tears and was unable to explain why he was crying. Dr. Weisberg explained that this was characteristic of patients with severe brain disfunction.
Further examination revealed that plaintiff suffered severe frontal lobe damage caused by the traumatic etiology consistent with the head injuries he received in the accident. Moreover, he suffered damage to the cerebellum which accounts for the difficulty he experiences in walking. This damage causes a widening in the amount of space between plaintiff's feet when standing. This increased distance in turn creates a staggering, unsteady gait which, in the absence of visual cues (such as walking in a dark room) causes Mr. Landry to lose his balance and fall.
Charity Hospital records showed plaintiff sustained multiple skull fractures consisting of fractures of the bone at the base of the skull, bones over the top of the head in the parietal region and in the back of the head in a region called the sagital sinus. In addition to the serious brain damage resulting in the conditions enumerated above, he suffered damage to his left eye and some damage to his right eye with decreased visual acuity to a level of 20/70. In addition, the right pupil and optic nerve were damaged resulting in permanent visual loss. He suffered decreased hearing in his right ear with nerve injury to the right side of his hearing system specifically to *1150 the eighth nerve or acoustic nerve. Appellee also has been impotent since the accident, a condition which Dr. Weisberg stated caused Mr. Landry a great deal of stress.
When questioned if plaintiff's problems could have occurred by spontaneous brain deterioration rather than trauma, Dr. Weisberg stated that given the fact that Mr. Landry was neurologically and behaviorally normal with no associated illness prior to the accident, his neurological problems, with reasonable medical certainty, were caused by the injuries received in the accident. Plaintiff has been and continues to be treated with 60 mgs of the powerful tranquilizer, Thorazine, three times per day. He concluded from the injuries described above that Mr. Landry is incapable of performing any kind of coordinated work and should not be left alone as he is a danger to himself and to others because he cannot care for his day to day needs and often experiences uncontrolled episodes of rage and anger towards others. The jury award of $500,000.00 in general damages and $94,000.00 for loss of income and earning capacity, past and future, is not an abuse of discretion, and is therefore affirmed.
II. MEDICAL EXPENSES PAST AND FUTURE
As part of its verdict, the jury awarded $1,354,547.00 for past and future medical expenses. The record reflects that of this amount plaintiff claimed $11,750.00 as actual medical expenses up to the date of trial. Since neither GM nor B.G.C. have complained as to any discrepancy in this amount, we affirm the award for past medical expenses in the amount of $11,750.00. The difference of $1,342,797.00 which represents the amount for future medical expenses is unsubstantiated by the record, and as to this amount we reverse.
Neither Dr. Wilcox nor Dr. Weisberg had anything of any substance to say about future medical expenses. Dr. Wilcox testified that a prognosis as to Mr. Landry's future medical needs could not be determined at the time he was discharged from the Public Service Health Hospital. Dr. Weisberg merely stated that in his opinion plaintiff would continue to deteriorate and may be unable to be cared for by his wife. However, he could give no definite time when this might occur. Neither doctor ever testified that Mr. Landry would require future institutionalization.
The jurisprudence of this state does not allow the jury to speculate as to the possibility of future medical expenses. The law of Louisiana is well settled that the trier of fact may not award any sum for future medical expenses if there has not been positive proof of the need for the expenses. Mere conjecture is insufficient. Wilson v. Magee, 359 So.2d 315 (La.App. 4th Cir.), affirmed in part, amended in part, 367 So.2d 314 (La.1979); Addison v. Traders and General Ins. Co., 212 So.2d 754 (La.App. 3rd Cir.1968); Brooks v. Kirkpatrick, 175 So.2d 342 (La.App. 2d Cir.1965); Johnston v. Peerless Ins., Co., 159 So.2d 415 (La.App. 2nd Cir.1963); Bailey v. National Surety Corp., 149 So.2d 669 (La. App. 1st Cir.), writ denied 244 La. 210, 151 So.2d 689 (1963).
In Poche v. Frazier, 232 So.2d 851 (La. App. 4th Cir.1970) this Court set out the standard of proof for the award of future medical expenses.
"Medical expenses in order to be recoverable must be proved and awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony (emphasis added) that they are indicated ... This Court cannot pull a figure out of the air and award it as damages for future medical expenses the occurrence of which is but a speculative possibility." Id. at p. 860.
Plaintiff asserts that the jury had a calculated hold on his future medical needs by the testifying witnesses consisting of himself, his wife, daughter and calculations and figures presented by the actuary and the economist. Clearly this is not testimony of future medical needs. *1151 Plaintiff contends that Dr. Weisberg's testimony that he will continue to deteriorate as a rapid rate and should not be left alone is proof of the need for future medical. We disagree. This testimony, although it is a prognosis as to his condition, is not substantial medical proof that future institutionalization will be needed. Dr. Weisberg had no opinion as to when such care might be needed. Plaintiff's own actuary and economist, because of the uncertainty that such care might be needed, based their calculations beginning two years from the date of trial and five years from the date of trial. This is consistent with the argument that the necessity of future institutionalization is speculation rather than certainty.
Finally, plaintiff attached to his brief reports from Dr. Kloor, Dr. Weisberg and Keesler Air Force base which state the possibility of future institutionalization. These documents are not in evidence, do not form part of this record, and thus are not considered by this court.
For the foregoing reasons the judgment in favor of Joseph N. Landry and against Bill Garrett Chevrolet, Inc. is hereby reversed. The judgment in favor of Joseph N. Landry and against General Motors Corporation is amended and as amended is affirmed as follows:

General Damages $500,000.00
Loss of Income, and Impairment
of earning capacity, past and
future 94,000.00
Medical expenses, past and future 11,750.00

All costs of this appeal to be borne by General Motors, Inc.
NOTES
[1] Bill Garrett's application for writs seeks to have the testimony totally excluded. Those writs were granted with the exact same language as used in the Landry writ. Although one could argue that the granting of those writs meant the Supreme Court intended to exclude the hypnotically induced testimony in toto, we believe they meant for us to consider the testimony as it appears in the record.
[2] Judge Ward, in a separate concurring opinion, felt the majority was incorrect on the foreseeability issue.
[3] This writer has previously expressed the view that the principles of Gonzales v. Xerox should be reviewed and/or expanded by our Supreme Court for several reasons. If the error committed at the trial level was such as to vacate a jury award, and the Court of Appeal is to decide the case as a matter of first impression on the record before it, what happens to the manifest error rule? The Louisiana Constitution provides that the appellate court's scope of review extends to law and facts. The word "review" indicates to this writer that there must first be a proper lower court determination of facts before the appellate court considers the issue. Of course, underlying all of these problems is the very important consideration of a litigant's statutory right to a jury trial.
[4] This was noted in our original opinion at p. 1061.